THE CHARLESTON INSURANCE AND TRUST COMPANY *vs.* JAS. J. CORNER AND THOMAS CORNER.—*December*, 1844.

Freight was insured on a voyage, at and from *M. V.* to *C. C.*, and at and from thence to *B.*, estimated at $4000.   It was due at *B.*, on the right delivery of the cargo there.   The vessel proceeded to *C. C.*, and there delivered and took in cargo.   While her lading was in progress, she was forcibly taken possession of by a foreign ship of war, and carried back to *M. V.;* where, after some detention, in March 1839 she was restored to her master, who claimed full freight from the charterer, which he resisted; and upon a submission to arbitration, the vessel was allowed $1200, and the charter party cancelled.   *C. C.* being now blockaded, the voyage was broken up and abandoned.   On the 2nd May 1830, (forty-seven days after her capture,) the master chartered her on another voyage, from *M. V.* to *H.*   In an action against the underwriter, it was HELD:

1st. That as a contract of insurance is one of indemnity, the doctrine of *salvage* for freight, has been introduced as a fair item in the adjustment of actual loss; and that the underwriter was entitled to a credit for the sum paid the master, on account of freight.

2nd. The doctrine of *salvage* for freight is confined to freight earned on the particular cargo contemplated in the policy, or other freight earned on the same voyage.   In such case, the insurer is only liable for the difference, because that is the extent of the actual loss by that voyage.

3rd. After time sufficient for the completion of the original voyage, had elapsed, the master of the vessel not being able to proceed on that, is at liberty to enter upon another, and distinct voyage: and the freight earned upon the latter voyage, will not enure to the benefit of the underwriter.

4th. The time in which a voyage should be performed, is a question of fact? and not to be assumed, or asserted by the court.

5th. Upon a policy for account of whom it may concern, in an action by *A.*, where the plaintiff did not disclose by the pleading, any other interest or damage, than that which *A.* had, or sustained, he cannot recover for more than the proportion in which he was interested.

Where the plaintiff offered in evidence verbal and written testimony, to maintain his issue in an action of *assumpsit*, part of which, in writing, was admitted by the defendant, as evidence of the facts recited in it ; part, as if regularly proved under a commission—another portion being a deposition of a witness, no part of the plaintiff's proof being contradicted, he cannot assume that the jury will find the facts accordingly; and pray the court to instruct them, upon that assumption.

The sufficiency of evidence to satisfy a jury, or the circumstance, that it is all on one side, does not authorize the court to direct them, that it proves a fact in controversy.

The jury have the power to refuse their credit to parol testimony, and no action of the court should control the exercise of their admitted right, to weigh its credibility.

A charter party granted and let on freight, the whole tonnage of a vessel, for a voyage from *M. V.* to *C. C.*, and thence to *B.* When the lading at *C. C.* was completed, she was to depart and proceed to *B.;* where the cargo was to be discharged, and thus end the voyage. In consideration of which, the charterer agreed to pay the owners a gross sum, "payable on the right delivery of the cargo at *B.*" The vessel received cargo at *M. V.;* proceeded to *C. C.;* where a part was landed, and a part of the cargo destined to *B.*, shipped. At this time she was was forcibly taken possession of by a ship of war, and carried back, by force, to *M. V.;* where she was, after some delay, restored to her master. Under such circumstances, the charter party did not impose an obligation on the charterer to pay the whole freight at *M. V.*, as if the vessel had proceeded to *B.* The intent of the charter was, that a full and complete cargo should be received at *C.* and delivered at *B.*, to entitle the owner to full freight; the charterer being in no default.

APPEAL from *Baltimore* County Court.

This was an action of *assumpsit,* commenced on the 31st December 1839, by the appellees against the appellants.

The plaintiffs declared, on the policy mentioned in the bill of exceptions, and assigned as a breach of the contract, that heretofore, to wit, on the 20th February 1839, divers goods of great value had been and were shipped and loaded at *Monte Video*, in and on board the said brig or vessel, in the said policy of insurance mentioned, to be carried and conveyed therein, on and for freight in and during said voyage, to wit,

at the county aforesaid, and that they, the said plaintiffs, were then and there, from thence until, and at the time of the loss hereinafter mentioned, interested in the freight of the said goods so shipped and loaded as aforesaid, to a large value and amount, to wit, to the value and amount of all the moneys by them ever insured, or caused to be insured thereon, to wit, at the county aforesaid. And the said plaintiffs in fact, further say, that heretofore, to wit, on 20th February 1839, the said brig or vessel, with the said goods on board thereof, departed and set sail from *Monte Video* aforesaid, on her said voyage towards *Corrientes* aforesaid, and that the freight of the said goods, in the case of her arrival there, would have amounted to a large sum of money, to wit, the sum of four thousand dollars; and that afterwards, and whilst the said brig was at anchor in the bay near *Cape Corrientes*, to wit, on the 16th of March 1839, the said brig or vessel, with said goods on board thereof as aforesaid, were on the high seas, to wit, at the county court aforesaid, with force and arms, and in an hostile manner boarded, captured, seized and forcibly taken possession of, and the *American* flag hauled down by the *French* vessel of war, the *Perle*, and the captain, officers and crew of the said brig *Eliza Davidson*, made prisoners, a part of whom were sent on board the said vessel of war, the *Perle*. And owing to the arrests, restraints and detainments of kings and princes, the said plaintiffs thereby, then and there lost, and were deprived of the freight of the said goods and merchandise so on board the said brig, on freight as aforesaid, at the county aforesaid; of all which said several premises, the said defendants afterwards, to wit, on the day and year last aforesaid, at the county aforesaid, had notice, and were then and there requested, by the said plaintiff, to pay them the said sum of $4,000, so by them insured to the said plaintiff as aforesaid, &c.

The defendants appeared and pleaded the general issue.

The jury found a verdict for the plaintiffs, $3,437.70, on which judgment was rendered.

At the trial of the cause, the plaintiffs offered in evidence the following proposal for insurance, accompanied by the letter of

*John I. Mattison*, of the 2nd of February 1839, and the consular certificate of *R. M. Hamilton*.

"Dollars four thousand, on freight of goods, estimated at—Dollars three hundred, on *Chronometer*.

The above sums are offered for insurance by *J. J. Corner & Bro.*, on account of whom concerned⠀⠀⠀(citizens of the *United States*,)⠀⠀⠀per the *American* brig *Eliza Davidson, Mattison* master, at and from *Monte Video* to *Cape Corrientes*, and at and from thence to *Boston.* The vessel safe at intended to sail on or about 14th February, from *Monte Video.* Sailed from⠀⠀⠀N. B. Every circumstance material for the underwriters to know, so as to form a just opinion of the above risk, is disclosed in this offer. 22nd April, 1839. The premium on the above vessel was fixed by the agent of the *Charleston Insurance and Trust Company*, at the agency in *Baltimore*, this 22nd day of April 1839, and at the rate of 1¾ per ct.

⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Accepted—J. J. CORNER & BRO."

"*Monte Video*, February 2nd, 1839. *Messrs. Jas. J. Corner & Bro., Baltimore.* Gentlemen,—Since my last, per *Mentor*, I have chartered the brig *E. Davidson*, to load part of a cargo at this port and proceed to *Cape Corrientes*, in the lat. of 38° south, and there load with a cargo of bale goods for *Boston*, allowing the shippers fifty lay days at the *Cape*, for the round sum of four thousand *Spanish* dollars. To obtain this freight, I have agreed to give them the use of what funds I may have, at par, for a draft at sight on *Boston.* I shall sail from here on or about the 14th inst. You will please make insurance on the amount of the charter, and $300 on a chronometer I bought here. The port I am about to proceed to is in the province of *B. Ayres*, but is not included in the blockade, as you will perceive by the annexed certificate of the *U. S. Consul.*

⠀⠀⠀I remain your ob't. serv't.,⠀⠀⠀JOHN I. MATTISON."

"*Consulate of the United States.* I, the undersigned, consul of the *United States*, do hereby certify that the [Consular Seal.] port of *Corrientes*, to which the brig *Eliza Davidson* is bound, is not within the limits of the blockade by the *French* squadron. Given under

my hand and seal at *Monte Video*, this 2nd of February 1839.

R. M. HAMILTON."

And the policy of insurance following, which was admitted to have been signed by *T. P. Williams*, the authorised agent of the defendants :

"By the *Charleston Insurance and Trust Company.* Open policy, No. 65. This policy of insurance wit-

Freight, nesseth, that the *Charleston Insurance and*
Chronometer. *Trust Company* have insured, and by these presents do insure *James J. Corner & Bro.*, at and from *Monte Video* to *Cape Corrientes*, and at and from thence to *Boston*, as per annexed endorsements, as well in his or their own name, as in the name or names of all and every other person or persons to whom the same doth, may or shall appertain, in part or in whole, lost or not lost: beginning the adventure respectively upon the property insured, that is to say, on all lawful goods and merchandize, from and immediately following the loading thereof, and so shall begin, continue and endure until said goods, merchandize or freight shall be safely landed: and on vessels, the risk shall begin at and from the places of departure, and so shall continue and endure till said vessel shall have arrived, and been moored at anchor twenty-four hours in safety, &c. The adventures and perils which the said *Insurance Company* are contented to bear, and take upon them, are of the seas, &c., enemies, pirates, &c., restraints and detainments of all kings, princes or people, of what nation or quality soever, &c.; and of all such other losses or misfortunes which have, or shall come to the damage or detriment of the property, or any part thereof, as insurers are legally accountable for. Warranted, nevertheless, by the insured, free from any charge, damage or loss, which may arise from, or in consequence of any illicit or prohibited trade, or trade in articles contraband of war, &c.

In witness whereof, the *Charleston Insurance and Trust Company* have caused these presents to be signed by their agent in the city of *Baltimore*, this 22nd day of April 1839.

THOS. P. WILLIAMS,

Agent of the *Charleston Insurance and Trust Co.*"

"$4090 on freight.   300 on chronometer."

They further offered in evidence the charter party, following, viz:

"This charter party of affreightment, made and entered into this 1st February 1839, between *John I. Mattison*, master of the brig *Eliza Davidson*, now lying in the harbor of *Monte Video*, of the one part, and *Alfred Peabody* of the other part.   Witnesseth, that the said *John I. Mattison*, for the consideration hereinafter mentioned, has covenanted, granted and let on freight, unto the said *Alfred Peabody*, the whole tonnage of the said brig *Eliza Davidson*, for a voyage to be made with the said brig, in manner hereinafter mentioned.   And the said *John I. Mattison* does hereby promise, that the said brig shall be staunch, &c., and that she shall receive on board from the said *Alfred Peabody*, goods to the amount of sixty tons, or thereabouts, with which she will proceed to *Cape Corrientes*, where she will discharge said goods, and receive on board from the said *Alfred Peabody*, a full and complete cargo of bales, &c., the same to be put on board at the expense of the said *Alfred Peabody*, and when the said lading is completed, to depart and proceed to the port of *Boston*, where the cargo is to be discharged; and being there arrived, the said lading to be delivered to the said *Alfred Peabody*, or his agents or assigns, and thus end the voyage, (excepting always against the dangers of the seas, robbers, pirates, restraints of princes and rulers, and all unavoidable accidents and calamities,) for and in consideration of which, the said *Alfred Peabody* consents, promises and agrees, to and with the said *John I. Mattison*, that there shall be paid to him, his agents or assigns, the sum of four thousand one hundred *Spanish* dollars, or equivalent, payable on the right delivery of the cargo at the aforesaid port of *Boston*.   And the said *John I. Mattison* further promises and agrees, to allow fifty running days to unlade, &c."

"The above charter party is cancelled this day.   *Monte Video*, April 2nd, 1839.        ALFRED PEABODY."

The plaintiff also offered in evidence, the protest made before the consul of the *United States* to the *Oriental Republic* of the *Uruguay*, by *John I. Mattison*, master, and others of the *American* brig, *Eliza Davidson* of *Baltimore*, who being duly sworn, did depose as follows:

"That he, the deponent, having engaged with *Mr. Alfred Peabody*, a citizen of the *United States*, to perform a voyage in the brig under his command, from *Monte Video* to *Loberia Chica*, on the coast of *Patagonia*, and from thence to *Boston*, in the *United States*, did sail from the said port of *Monte Video* on the 20th February 1839; and that on the 23rd of same month, at 1 o'clock, P. M., made the land, the north part of *Cape Corrientes*, distant about ten miles, and at 4 o'clock, P. M., the harbor near *Corrientes* bore W. N. W. seven miles, at which time he tacked, &c. On the 24th made the land again, bearing W. N. W., the weather being boisterous, kept an offing; on the 25th, at 6, A. M., the weather having become moderate, made all sail for the land; at 10 h. 30 m. A. M., made *Cape Corrientes*; at 1 h. 30 m. P. M., came to anchor in the bay; on the 26th, the deponent went on shore, and returned with some laborers in the boat, and commenced discharging his cargo, &c; on the 3rd March, discharged and received a cargo on board; the 4th, weighed the anchors and run near the shore to make a better harbor—discharged and received cargo on board, &c.; the 16th same month, observed a vessel in the offing, being the first since their anchorage in the bay; at 10 A. M., she proved to be the *French* vessel of war, "the *Perle*," which boarded the brig and took immediate and forcible possession, and hauled down the *American* flag, and made prisoner of the deponent, his officers and crew, part of whom were sent on board the *Perle;* these steps were taken by the *French* officer and his crew prior to his asking for the vessel's papers, or any question by which they could have ascertained the national character of the said vessel—eleven *Frenchmen* remained in charge of the brig, with their arms about them; at 4 P. M., they descended into the hold, and drew off a portion of wine and rum for their use, being part

of the cargo; at 5 P. M., they attempted to get the brig under way, in doing which, they upset the windlass, and carried away the greater part of the pall plates; at 6 A. M., they concluded to remain at anchor during the night, and set a watch, five men in each, all armed—in hoisting some casks of water on board, they spilled a large quantity on the goods in the hold, which caused considerable damage; on the 17th, strong breezes from the northward and eastward; at 6 A. M., the boats of the *Perle* boarded us with about twenty men, and immediately got the brig under way, cutting the running rigging and breaking many articles that came in their way; they also broached the brig's provisions, and used them without ceremony. March 18th, the *French* crew regularly drew from the cargo three buckets full of wine per day, and used the brig's provisions extravagantly, and the vessel was managed so badly, that the deponent considered the safety of the vessel, and his life in great danger, there being but two able seamen among the *French* crew; on the 20th same month, at 8 A. M., made *Monte Video*; at 1 P. M., came to anchor within half gunshot of the flag ship of the *French Admiral*, after which an officer from the *Perle* came on board, and took an inventory of the cargo on board, and the vessel's roll, clearance and bill of health; on the 21st, the mate of the brig was sent from the *Perle* on board, and the deponent was permitted to go on shore, the *French* crew still in the possession of said brig, and the greater part in a state of intoxication, having free access to the wine and spirits, and provisions generally; 25th, at 1 P. M., *Commodore Nicholson*, in command of the *U. S. Squadron*, came along side of the brig, accompanied by the *American Consul*, and took the deponent on shore for the purpose of an interview with the *French Admiral*, who, through the demand of *Commodore Nicholson*, determined to give up the vessel and cargo on board, to the deponent, but refused any remuneration as damages for the detention and illegal capture of said brig. On the 26th same month, at 7 A. M., a boat from the *Perle* came along side, and placed the original crew of the brig on board, and took the *French* officer and crew from on board,

53   v.2

thus delivering the vessel to the deponent, after having forcible possession for ten days, during which time the said brig suffered severely in her sails, rigging, &c., in consequence of negligence and the incapacity of the *French* crew. And the deponent further declares, that he was not asked for his vessel's papers until nearly half passage to *Monte Video*, from *Loberia Chica*, and that he then refused them, upon the ground that he had been illegally captured, and that the said papers should have been asked for prior to taking and holding possession of the said vessel, and that after the anchorage near the *Admiral's* ship, an officer from the *Perle* came on board and demanded the papers, which were delivered by the deponent, viz: roll, clearance, and bill of health, which were afterwards returned. Therefore, &c.

Signed,          John I. Mattison."

And which was admitted as evidence of the facts therein recited.

The certificate of *Alfred Peabody* declared that, " On the first day of February 1839, I chartered from *Capt. J. I. M.*, the brig *E. D.*, under his command, and lying in the harbor of *M. V.*, for a voyage hence to *C. C.*, and thence to the port of *B.*, for the round sum of $4,100; that the the said brig proceeded to her first place of destination, and while there, partially laden, was forcibly taking possession of by one of the *French* blockading squadron, and brought to this port, by which act, the voyage was destroyed. That *Capt. M.*, on his arrival here, claimed the full amount of the charter of his vessel, as per charter party, which I refused to comply with, on the plea, that he had not fulfilled his part of the contract by the non-completion of the voyage; that *Capt. M.* refused to deliver up any part of the cargo taken on board at *C. C.*, until his charter was satisfied; that to avoid unnecessary expense and delay, we finally agreed to leave the matter to arbitration, and that it was settled accordingly. I further certify, that had *Capt. M.* refused to comply with the decision of the arbitrators, and had still insisted on the full amount of his charter, I should have protested against him, having ad-

vised the consul of the *United States* of my intention to that effect, and should have applied to the authorities here to have detained his vessel until the property on board of her had been delivered up to me, on my paying that portion of the charter determined by the arbitrators. In testimony whereof, I hereunto set my hand, this 30th April 1840.

ALFRED PEABODY."

Which it was agreed should be received as evidence as fully as if regularly proved under a commission.

The plaintiff also proved the awards following:

"Having been called upon to arbitrate in the case of a dispute which has arisen between *Mr. Peabody*, the charterer of the brig *E. D.*, and *J. M.*, the master of that brig, with regard to the amount that should be paid the said master, (on the discharge here of the cargo now on board that vessel,) to cancel the agreement entered into between the two parties. I beg to say, that I have perused the charter party—have also heard the explanations made by both parties, and now give it as my opinion, that *Mr. P.* should pay the said *Capt. Mattison* $1,200, in full of all demands.        ALEX. ROGERS.

*Monte Video*, 1st April 1839."

"In the case of the brig *E. D.*, chartered, &c. My opinion is, that in consideration of *Captain Mattison* having fulfilled, as far as in his power, the contract entered into, carrying and delivering the quantity of cargo agreed on, to *Cape Corrientes*, and having brought seventy-six bales, admitted to be one-fourth of a cargo for the vessel, to *Monte Video;* and further, by performance of this part of the voyage, encountered the risks and perils which the difference of freight from *Monte Video* to *Boston*, and from *Monte Video* via *Cape Corrientes*, to same port, prove to be greatest, the one, at the time, being about two thousand hard dollars, the vessel is entitled to one-half for her freight. As, however, the charterer does not derive benefit from the part of the voyage performed, to any thing near that proportion, my idea is, that the third party causing the non-fulfilment of charter, should be called on and made accountable for the difference, and suggest the following mode

of settlement: that the charterer pay to the vessel $1,200 in full, for the part of the voyage actually performed, receiving the bales from on board in *Monte Video;* and that his claim on the *French Government* for the balance, say eight hundred and fifty hard dollars, if recovered, be paid over to *Capt. Mattison.* By such an arrangement, the loss sustained would fall equally on either party, which, in equity, it should; neither being culpable for the want of performance and unlooked for difficulties that have occurred.        ROBT. C. McLEAN.

*Monte Video*, 1st April 1839."

The cancellation of the charter party of the 1st of February 1839, was admitted.

The defendant thereupon proved that *John I. Mattison*, the master of the brig *Eliza Davidson*, was a part owner of the said brig, at the date of the said charter party of the 1st February 1839, and of said policy of insurance, and has so continued down to the present time; and that said owners received from *Alfred Peabody* the sum of $1,200, awarded as is hereinbefore stated. The defendant further offered in evidence the charter party, following:

"Contract of affreightment entered into before me, the undersigned, licensed broker, between *Messrs. James Cruset* and *John I. Mattison*, Captain of the *American* brig, *Eliza Davidson, Messrs. Southgate & Co.* being her consignees.

Article 1st. *Mr. James Cruset* freights from her captain, *John I. Mattison*, the *American* brig *Eliza Davidson*, to load with meat for *Havana*, obliging himself to put on board from four thousand five hundred to five thousand quintals of meat, at most, and to pay for freight, $5,000, in gold or silver, over and above the sum of five per cent. *capa*, (a kind of commission not known to the translator.)

Art. 2nd. *Capt. Mattison* allows the freighter one hundred and thirty days for the loading at this port of the *Eliza Davidson*, and her discharge of cargo in *Havana;* and if, at the end of that time, any part of the cargo should remain on board, the freighter shall pay $25 per day demurrage, for every day thereafter.

Art. 3rd. *Capt. Mattison* obliges himself to place his vessel in all proper condition, sound and dry, to prosecute the voyage.

Art. 4th. The freighter obliges himself to provide payment for storage, and to pay for the straw which may be necessary for the proper conveyance of the meat.

Art. 5th. *Capt. Mattison* obliges himself to consign himself and vessel to such house in *Havana*, as the freighter may designate, and will pay to his consignees two and a half per cent. commission for the collection of freight.

Art. 6th. The time above designated, will commence running from the 3rd day of May, and will cease on the day when the freighter shall advise the captain that the cargo is ready. It will begin to run in Havana, from the day that the vessel is ready to discharge; both the contracting parties sign the above contract by common consent, and bind themselves to its fulfilment respectively; the one by his cargo, the other by his vessel, apparel, freight, &c.

(Signed,)      JAMES CRUSET,<br>
JOHN I. MATTISON."

"Before me,    FRANCISCO A. GORNEZ, licensed broker. *Monte Video*, May 2nd 1839."

"Note.—Twenty of the days limited above, for the loading and discharge, were consumed in *Monte Video*, leaving only for the discharge in *Havana* sixty days, (60.)

(Signed,)      FRANCISCO A. GORNEZ.<br>
JAMES CRUSET.

*Monte Video*, July 13th 1839."

"The above is a correct translation of the document referred to me for translation.      S. TEACKLE WALLIS.

15th June 1843."

Which it was admitted was executed by the parties hereto. That the voyage therein stipulated to be performed by the *Eliza Davidson*, (the brig mentioned in the policy of insurance,) was performed by him to *Havana*, and the freight of $5,000 earned by her, and paid to the owners; and that said voyage to *Havana*, was a shorter voyage than would have been that to

*Boston*, and on the way home, to the port of *Baltimore*, of said brig, where she belonged.

The plaintiffs then offered in evidence the deposition of *Shadrach Hudgins:* that he was mate of the brig *E. D.* on her voyage from *M. V.* to *C. C.*, and from thence to *Boston*, to be performed under a charter party. The voyage commenced in the beginning of the year 1839, and at *M. V.* they took in a cargo for *Corrientes*, and proceeded to *Corrientes*, where the cargo was landed, and they commenced taking in a cargo for *Boston;* and when they had taken in a part of the cargo, about one-fourth, they were seized by a *French* corvette, and all the crew removed to the corvette, and the brig taken possession of by the *French.* The *French* did a great deal of mischief to the said brig; left all her boats ashore; broke the windlass; destroyed the greater part of the running rigging; and the vessel was brought as a prize to *M. V.* He further states, that the crew and vessel were detained about ten days in *M. V.*, before they were released; as he understood at the time, *C.* was declared in a state of blockade, and said brig was prohibited from going there. After their release, they remained in *M. V.* upwards of forty days, when the said vessel got a freight for *Havana.* In consequence of this declaration of blockade, the voyage to *Boston* was broken up. The blockade continued for two years afterwards.

Cross examined. Witness understood that the freight for Havana, amounted to $4,000. At *M. V.*, the windlass was mended; did not get new sails; had a carpenter employed about a week mending the windlass, and doing some caulking; the caulking was not occasioned by the blockade. They did not know that *B.* was about to be blockaded before they went there, on the contrary, all the consuls there, except the *French* consul, said that it was not in a state of blockade. The *French* were, at that time, blockading *Buenos Ayres.* No application was made by him, or by the captain, to his knowledge, to the *French* consul, to ascertain the condition of the war, or whether *Corrientes* was blockaded. He knew that the cargo they had in had come from *Buenos Ayres.*

Examined in chief. Deponent states that the *French* were blockading the river *Plate;* that *Corrientes* is not in the river *Plate,* but 60 miles south of *Cape Antonio;* that in unlading the outward cargo, and taking in a part of the inward cargo, they were occupied nineteen or twenty days, during all which time, they never saw a *French* vessel of any kind; that they knew that the *French* were carrying on a general war with *Buenos Ayres.*

Cross examined. Deponent heard from *Mr. Corner* or *Mr. Glenn,* that the whole matter had been compromised.

Examined in chief. Deponent states that one part of the *French* fleet were above *Monte Video,* and the other off *Monte Video;* they saw no vessels below *Monte Video.*

Whereupon, the plaintiffs prayed the court to instruct the jury as follows:

1st. That the true construction of the policy of insurance, given in evidence in this case, is, that the defendants assured the risk of loss arising from restraints and detainments of all kings, princes or people, and were of course liable for the loss arising from the capture and detention of the brig by the *French* vessel of war, "the *Perle.*"

2nd. The true construction of the charter party of *Peabody,* also offered in evidence, is, that no freight was to be due by the charterer, unless the voyage undertaken was performed, and the goods safely delivered at the termination of the voyage at *Boston,* and this, notwithstanding it was prevented by the said capture and detention of the *Eliza Davidson,* by the said *French* vessel of war.

3rd. That as the *Cape Corrientes* was blockaded on and after the *Eliza Davidson* was released at *Monte Video* from the capture and detention of said vessel of war, it was impossible for the vessel to earn her freight under said charter party, and that therefore the policy of insurance in question was forfeited, and the plaintiffs are entitled to recover.

And the defendants prayed the court to instruct the jury as follows:

1st. The defendants in the above cause, prays the court to instruct the jury, that if they shall find from the evidence, that on the 1st day of January 1839, the defendant executed the policy of insurance offered in evidence in this cause, that on the 1st day of February 1839, the charter party offered in evidence, was entered into by *Capt. M.*, the master of the *E. D.*; that in pursuance thereof, the said brig proceeded to *C. C.*, and there discharged her outward cargo; that whilst engaged in taking on board the lading stipulated by the charterer to be furnished for transportation to *B.*, said brig was seized by the *French* brig of war, the *Perle*, and by her held from the 16th of March 1839, till the 25th day of the same month, when said brig *E. D.*, was surrendered to *Capt. M.*, who, with his crew, took possession of the same; that at the time of her seizure by the *French* brig, said brig, *E. D.*, had on board of her one-fourth of the cargo stipulated by the charterer, to be furnished for transportation to *B.*; that being in that condition, the master of said brig demanded of the charterer, (who insisted upon breaking up the contemplated voyage, upon the ground, that the port of *C. C.* was declared by the *French*, to be in a state of blockade,) the full amount of the freight stipulated for in the charter party of the 1st of February, 1839; that said charterer refusing to pay the same, the matter was submitted by the said master and the charterer to arbitration; and that the arbitrators chosen by the parties, awarded $1,200 to be paid by the charterer, as a compensation for what had been done under said charter party, which was accepted by said *M.*; and that said charter party, by the mutual consent of the said master and the charterer, was thereupon cancelled; that said brig, *E. D.*, afterwards, to wit, on the 2nd May 1838, was chartered for a voyage to *Havana*, at and for the freight of $5,000, as shown by the charter party offered in evidence, and that said brig performed said voyage, which was a shorter voyage than that from *M. V.* or *C. C.* to *B.*, and received the freight stipulated to be paid them; and shall further find that said master, *Mattison*, at the time said policy of insurance was effected, and during the whole period covered by the transactions here-

inbefore recited, was a part owner of said brig, *Eliza Davidson*, and still is such part owner, that then the plaintiffs are not entitled to recover in this action, on the first count in their declaration.

1st. Because no loss of freight was sustained by the plaintiffs, upon the voyage, covered by the policy of insurance, within the terms of said policy, or the perils thereby insured against.

2nd. Because upon the true interpretation of the charter party, of the 1st February 1839, the charterer, *A. Peabody*, was answerable, under the circumstances above stated, for the whole amount of freight stipulated to be paid by *A. Peabody*, upon the voyage to *Boston*, and that *Captain Mattison*, one of the owners of said brig *E. D.*, having consented to the cancellation of said charter party, and thereby discharged the said *Peabody* from his obligation to fulfil it, has released the defendant from all responsibility, upon the policy offered in evidence in this cause.

3rd. Because the reference and adjustment at *M. V.* having been made, without the knowledge or consent of the defendant, and having been followed by the cancellation of that charter party, with the consent of one of the assured, *M.* being a part owner of said brig, discharged the defendant from all liability upon said policy.

4th. Because under the circumstance stated, the said owners of said brig *E. D.*, laid a claim for full freight, under said charter party, and that having on board one-fourth of the homeward cargo, they had a lien on it for said freight, and that it was their duty to have prosecuted their voyage to *B.*, after the time limited by said charter party, for the lading of said vessel, and that having relinquished said lien, in the manner shown by the evidence, the defendant was discharged from all liability on said policy.

5th. Because by the second charter party offered in evidence, the said plaintiffs, within the period necessary to perform the voyage under the first, having carried freight to a larger amount

than is claimed in the present suit, sustained no damages, which they are entitled to exact in this suit.

6th. The defendant prayed the court, further to instruct the jury, that even if the plaintiffs are entitled to recover in this case, that being the owners of but two-thirds of said vessel, the *E. D.*, they are entitled to recover but two-thirds of the amount due upon the policy of insurance declared upon, after deducting the sum of twelve hundred dollars, received from *A. Peabody*, notwithstanding that they have sued for the whole amount so due.

And the court, (MAGRUDER, A. J.,) thereupon gave to the jury, the instructions prayed for by the plaintiffs, and rejected those prayed for by the defendant. The defendant excepted to the said opinion of the court, granting the prayers of the plaintiffs, and to each of them, and to the said opinion rejecting the prayers of the defendant, and to each of them.

The *Insurance Company* prosecuted this appeal.

The cause was argued before ARCHER, C. J., DORSEY, CHAMBERS and MAGRUDER, J.

By Z. COLLINS LEE and NELSON for the appellants, and
By REVERDY JOHNSON for the appellees.

CHAMBERS, J., delivered the opinion of this court.

The instructions asked by the appellee, who was plaintiff below, were not based on an assumed state of facts, to be submitted to the consideration of the jury. They were moved, it would seem, in the confidence, that as the evidence was uncontradicted, the jury could not do otherwise than find the facts accordingly.

They are, in effect, an assertion by the court, in the first and second instructions, that the *Eliza Davidson* was captured and detained by the *Perle;* and in the third instruction, that *Corrientes* was blockaded on and after the ship's release at *Monte Video*. Doubtless the jury would have found these facts according to the testimony, but the sufficiency of evidence to satisfy a jury, or the circumstance, that it is all on one side,

does not authorise the court to direct the jury, that it proves the fact. They have the power to refuse their credit, and no action of the court should control the exercise of their admitted right, to weigh the credibility of evidence. In thus incautiously expressing their opinion, the court erred.

The appellants deny the right of the appellee, to recover on the state of facts set out in the defendant's first prayer, on various grounds.

The first four reasons assigned in the record, are based upon the assumption, that the ship was entitled to full freight, and might have earned it by proceeding on the voyage, with the part of her cargo received, when she was seized and driven off.

If the construction given to the charter party by the appellants, could be adopted, this objection must be sustained. That construction is, that *Peabody*, the charterer, under the circumstances which occurred, was answerable for the whole amount of freight, which would have been earned by the successful prosecution and termination of the contemplated voyage. Was such the meaning of the charter? It is to be construed as other contracts, so as to effect the design of the parties, apparent by its terms. The evidence is, that about one fourth of the cargo was taken in at *Corrientes*; and there is no allegation of unwillingness, or want of readiness or preparation, on the part of the charterer, to furnish the residue of the lading. It would, therefore, seem to require very explicit language to justify the inference, that in such a state of things, the charterer intended to pay full freight. If it can be demanded in a case where an enemy's force, by seizing and driving away the ship, after receiving one fourth part only of the cargo, why may it not be in a case, where one hundreth part only is taken in? If full freight is due, where, by a hostile force, the ship is prevented from loading more than a very minute portion of the cargo, why not, if, after receiving a full cargo, a hostile force were to seize and carry off a very large proportion of the cargo, before the ship had left her port of lading? In these cases, full freight certainly could not be

charged.   We think the apparent intent of this charter party, was, that "a full and complete cargo" should be received on board at *Corrientes*, and delivered at *Boston*, to entitle the owner to full freight; and that in the event, which actually happened, it was at least doubtful, whether the charterer could have been compelled to pay any freight on the small portion of the cargo received, and which was violently seized, and taken to *Monte Video*.   We think the appellants have no cause, therefore, to complain of the adjustment between *Peabody* and *Mattison*.

The next reason assigned, is, that the freight which was actually earned and received, on the voyage from *Monte Video* to *Havana*, or so much of it as would repay the loss claimed by the appellees, ought to be applied as *salvage*, to the relief of the underwriters, in this case.

It is rightly argued, that the contract of insurance is one of indemnity, and the doctrine of *salvage* for freight, has been introduced as a fair item in the adjustment of actual loss.   If therefore, the particular freight, that is to say, the freight on the particular cargo contemplated in the policy, be not earned, but other freight be earned in the same voyage, the insurer will only be liable for the difference, because, that is the extent of actual loss by that voyage.   No case, however, has extended the doctrine so far as is now claimed.   This is not the case of a suspended voyage, afterwards pursued, nor is it the case of a prosecution of the same voyage, with a different cargo. The first voyage was completely and finally broken up and ended, in consequence of the ship's being driven off from the port of lading, and without a prospect of permission to return. Time had elapsed sufficient for the completion of the original voyage, when, at a different port from that of her intended lading, she received a different cargo, for a different destination, on which she earned freight.

There must be some limitation, in regard to time, as well as distinction, in the application of this doctrine.   It cannot be required, that a ship shall remain, year after year, awaiting the restoration of peace, or removal of an embargo, so as to allow

her to return to her original port of lading; or to remain, for any indefinite period, waiting for a cargo to her port of destination. The inconvenience, not to say ruinous consequences of such a doctrine, are too manifest to require detail. In like manner, it would be quite impossible to maintain, on principles of policy, or by authority, that the first subsequent voyage, whatsoever might be the port of lading or of destination, must be made subject to this claim for *salvage*, on the freight of the interrupted voyage.

Great difficulty may be found in ascertaining the precise limits, within which the doctrine should be applied; but we do not think, that any adjudged case will authorise us to include this within its letter or spirit.

The fifth reason is subject to the additional exception, noticed in considering the prayers of the appellees. The time in which either of the voyages alluded to, should be performed, is a question of fact, and not to be assumed and asserted by the court.

The last objection stated in the record, respects the right of the plaintiffs below, to recover more than the proportion, in which they were owners. This, we think, was rightly abandoned, as altogether untenable. See *Phil. on Ins.* 593, and the numerous cases there cited.

The result is, we concur with the court below, in their several opinions on the instructions asked for by the appellants below, but differ from that court, in respect to the opinions expressed on the prayers of the appellees, the plaintiffs below.

JUDGMENT REVERSED AND PROCEDENDO ORDERED.